CHARLES RIVER CONSTRUCTION COMPANY, INC., & others[1]
*vs.* JAMES N. KIRKSEY & others[2].

Middlesex. April 11, 1985. — July 10, 1985.

Present: BROWN, KAPLAN, & FINE, JJ.

*Practice, Civil*, Jury trial, Verdict, Instructions to jury. *Consumer Protection Act*, Jury trial, Damages, Costs. *Contract*, Performance and breach, Damages. *Damages*, Breach of contract, Unlawful interference, Consumer protection case. *Unlawful Interference*.

The fact that the judge in a consumer protection case, under the mistaken impression that the plaintiffs had a right to a jury trial, allowed the case to be tried to a jury over the defendants' objection did not, in the circumstances, require reversal. [337-339]

In an action on a contract providing that the plaintiffs would purchase certain lots in a subdivision and construct houses on them, that the defendants, the owners of the subdivision, would provide specified services in developing the subdivision, and that the plaintiffs and the defendants would jointly market the houses and lots in question, the jury were warranted in finding that the defendants had breached the agreement, that the plaintiffs' failure to perform the agreement completely was excused by the defendants' breach, and that the plaintiffs' damages amounted to $200,000. [339-342]

In an action against three defendants for unlawful interference with a contractual relationship, in which the jury, in returning verdicts against the defendants, noted percentages before the name of each defendant without having been instructed to provide such information and without having been instructed on degrees of culpability, the judge did not err in holding the percentage assessments to be a nullity and in ruling that the three defendants were jointly and severally liable. [342-343]

In an action for breach of contract and violations of G. L. c. 93A, in which the jury assessed damages of $75,000 on the c. 93A claim and added, without having been instructed on the matter, that this amount was "not

---

[1] Kenneth L. Kaplan and W. Hampton Smith, who were parties to the "Binding Letter of Intent" individually and as representatives of Charles River Construction Company.

[2] William Kirksey (the Kirkseys were named individually and doing business as Kirksey Associates), Hanner Built Homes, Inc., Karl L. Hanner, and Greg Mitrakas, doing business as Greg Mitrakas Realtors.

included" in the $200,000 the jury had assessed as damages for breach of contract, the judge did not err in ordering the $75,000 subsumed in the contract award. [343-344]

In an action for breach of contract and violations of G. L. c. 93A, the judge did not abuse his discretion in denying the plaintiffs' request for reimbursement for the fees of an expert witness, where multiple claims in addition to the G. L. c. 93A claim had been litigated and where the testimony of the expert witness had substantial significance in relation to the common law contract claim. [344-345]

In an action for breach of contract and unlawful interference with contractual relations, in which the jury assessed damages of $100,000 on the unlawful interference claim, stating in response to a specific question that this amount was not subsumed in the contract damages, the judge did not err in ruling as matter of law that these damages were subsumed in the contract damages awarded. [345-346]

Where the jury in finding damages for the plaintiffs on a claim for breach of a fiduciary duty specifically stated that these damages were included in an award for the plaintiffs on a breach of contract claim, any error by the judge in setting aside the verdict on the breach of fiduciary duty could not have harmed the plaintiffs. [346-347]

CIVIL ACTION commenced in the Superior Court Department on September 20, 1982.

The case was tried before *William G. Young*, J.

*J. Owen Todd* for the defendants.

*Paul S. Samson* for the plaintiffs.

FINE, J. A substantial business deal went awry, leading to this complex litigation. Judgment entered for the plaintiff for $200,000 with interest and a $50,000 attorney fee. All parties have appealed.

*Factual background.* The evidence at trial would have allowed the jury to find the following facts. In 1979, two of the defendants, James N. and William Kirksey (the Kirkseys), purchased Shefford Village in Marlborough, an approved but undeveloped subdivision composed of forty-seven single family house lots and a park area. The Kirkseys planned three phases of development. Phase I had been completed prior to Charles River's involvement. For Phases II and III, the Kirkseys entered into a written contract, termed a "Binding

Letter of Intent" (BLI), with Charles River Construction Co., Inc. (Charles River). The BLI, dated July 26, 1980, provided that Charles River would purchase three designated lots in the subdivision at stated times. The contract also provided that Charles River would be the exclusive contractor for the construction of the single-family houses to be built on all the lots except for five of the fifteen in Phase II and eight of the twenty-three in Phase III. The Kirkseys reserved the right to sell those five and eight lots (the reserve lots), respectively, without using Charles River as the builder. The Kirkseys and Charles River agreed to market jointly the houses and lots as packages, with twenty-two percent of the package price for each lot and house, or at least $20,000, being paid to the Kirkseys. The Kirkseys agreed to provide water and sewer connections and finished and approved roadways and sidewalks. They also represented that they had obtained all necessary approvals under the Wetlands Protection Act (G. L. c. 131, § 40).

The agreement was to terminate at the election of Charles River or in five years, whichever came first. The Kirkseys retained the right to terminate the agreement if a specified quota of house sales should not be met or "[i]f the holders of the first or second mortgage demand payment and the sale of some or all of the lots reserved by Kirksey Associates . . . is insufficient to pay off said mortgage loan(s)" (mortgage termination clause). The BLI was expressly contingent "upon Charles River obtaining construction financing." On June 3, 1981, the parties entered into a handwritten supplement to the BLI, which, among other things, amended it to eliminate the requirement that Charles River meet a sales quota, and to require instead that Charles River sell houses on a best effort basis.

At the time they signed the BLI, the Kirkseys also orally agreed that, by the fall of 1980, they would complete a subdivision road and accompanying sidewalks and begin other specified work. The specified work was not performed by the Kirkseys as promised. Nor did William Kirksey work on mar-

keting the project. Although houses had been constructed on two lots purchased by Charles River, because of a drainage easement problem, work had to be stopped on a third lot, and no houses had been constructed on any of the lots owned by the Kirkseys.

From May through July of 1982, the Kirkseys attempted to persuade Charles River to release them from their obligation to work together with Charles River on lots 5 and 6 so that the Kirkseys could sell the lots to Hanner Built Homes, Inc. (Hanner Built), another builder. Charles River consistently refused. On July 23, 1982, the Kirkseys, through a real estate broker, Greg Mitrakas, conveyed lots 5 and 6 to Hanner Built for $26,000 per lot. At the closing, the Kirkseys and Karl L. Hanner agreed that the Kirkseys would indemnify Hanner and Hanner Built to the extent of their liability should a suit be brought by Charles River. Charles River learned of the sale of lots 5 and 6 to Hanner Built in late August or September and commenced this action on September 20, 1982. By that time the relationship between the parties had deteriorated. On September 28, 1982, the Kirkseys sought to exercise their right to terminate the agreement pursuant to the mortgage termination clause.

The complaint, which contained numerous counts, was brought against the Kirkseys (individually and doing business as Kirksey Associates), Hanner Built, Hanner, and Mitrakas. Charles River sought from the Kirkseys specific performance of the alleged joint venture undertaking and a contract to convey certain lots, and damages for breach of the BLI, for breach of a fiduciary duty, for interference with Charles River's prospective advantageous contractual relations concerning lot 5, and for violations of G. L. c. 93A. From Hanner Built, Hanner and Mitrakas, Charles River sought damages for interference with its advantageous contractual relations with the Kirkseys concerning construction on lots 5 and 6 and a declaration that it was the equitable beneficiary of a constructive trust of the proceeds of the sale of lots 5 and 6. Some of the claims were tried to a jury. All but one of the equitable claims were tried to the court.

We deal first with those issues raised on appeal by the defendants.

*The jury verdict on the chapter 93A claim.* Charles River demanded a jury trial as of right on its c. 93A claim. Except for the multiple damage portion, the c. 93A claim was tried, over a timely objection by the Kirkseys, to a jury. After the verdict, but before the issuance of the judge's memorandum of decision and the entry of judgment, the Supreme Judicial Court handed down its decision in *Nei* v. *Burley*, 388 Mass. 307, 311-315 (1983). That case held that there is no right to a jury trial in c. 93A actions. The Kirkseys moved for a new trial on the c. 93A claim. Citing *Parker* v. *Simpson*, 180 Mass. 334, 355 (1902), the judge denied the motion, reasoning that it was within his discretion to submit the claim to the jury.

Had the judge made a discretionary determination before the trial commenced to frame issues for the jury to decide on the c. 93A claim, his action would have been proper. Mass.R. Civ.P. 39(c), 365 Mass. 802 (1974). *Parker* v. *Simpson, supra. Pappathanos* v. *Coakley*, 263 Mass. 401, 406 (1928). *Boston* v. *Santosuosso*, 307 Mass. 302, 323 (1940). *Marcoux* v. *Charroux*, 329 Mass. 687, 688 (1953). The jury verdicts would have been binding and not merely advisory. See *Westfield Sav. Bank* v. *Leahey*, 291 Mass. 473, 475 (1935), and cases cited, and Reporters' Notes to Mass.R.Civ.P. 39, Mass. Ann. Laws, Rules of Civil Procedure at 177 (1982). The Kirkseys make two arguments as to the inapplicability of that procedure to salvage the c. 93A verdict. First, they point out that the judge, under the impression at the time that Charles River had a *right* to a jury trial, did not in fact exercise any discretion *before* the case was submitted to the jury. And second, the Kirkseys say that even if the judge had exercised his discretion to submit the c. 93A claim to the jury,[3] he should have framed narrow

---

[3] The judge entitled the verdict form "Special Jury Questions." The form contained five questions, each relating to a separate count in the complaint. The question posed to the jury which related to the c. 93A claim was the following: "On the unfair or deceptive practices theory, we find for (James N. Kirksey, William Kirksey, Charles River Construction Co.) and assess damages in the sum of ___ against (James N. Kirksey, William Kirksey)."

questions instead of asking for a general verdict. We are not impressed with either of these contentions as a justification for setting aside the verdict. As to the first argument, we note that the judge exercised his discretion as soon as it became clear that the plaintiff did not have the right to the jury trial. The judge's exercise of discretion may reasonably be construed as relating back to the period the trial began. That is, we may read the judge's posttrial decision to mean that, had he known at the outset of the trial that he was not bound to allow a jury trial, he would have exercised his discretion to allow one nevertheless. This posttrial decision was both practical and fair. As to the second argument, we do not think the question submitted for the jury's decision was so broad as to constitute an abuse of discretion. In reality, the question was composed of several separate subparts, each narrow in scope. The first subpart asked whether James Kirksey committed an unfair or deceptive practice. The judge's instructions to the jury properly defined the term "unfair and deceptive practice." The second subpart posed the same question with reference to William Kirksey. The third subpart asked for an assessment of damages. These questions were not substantially different in scope from those routinely put to juries as framed issues. See, e.g., *Wright* v. *Fisher*, 234 Mass. 70, 72 (1919); Nolan, Equitable Remedies § 125, at 250-251 (1975).

More fundamentally, we question whether a "right" to a nonjury trial is one which we should enforce by reversing a judgment based upon an otherwise proper jury verdict. At least we would be hesitant to do so in a case such as this in which the controverted facts were not inappropriate for a jury's consideration. Rule 39(b), 365 Mass. 802 (1974), as modified by rule 39(c) (framing jury issues), does provide that "[i]ssues not demanded for trial by jury . . . shall be tried by the court." Thus, there is some basis for the assertion of a "right." The Kirkseys, however, have no constitutional right to a nonjury trial. *Beacon Theatres, Inc.* v. *Westover*, 359 U.S. 500, 510 (1959). *Hurwitz* v. *Hurwitz*, 136 F.2d 796, 798-799 (D. C. Cir. 1943). *Doughty* v. *Nebel Towing Co.*, 270 F. Supp. 957, 961 (E.D. La. 1967). See also Note, The Right to a Nonjury

Trial, 74 Harv. L. Rev. 1176, 1176-1178 (1961). Cf. *Common-wealth* v. *Paiva*, 16 Mass. App. Ct. 561, 562 n.1 (1983), citing *Singer* v. *United States*, 380 U.S. 24 (1965) (criminal defendant has no constitutional right to bench trial). And G. L. c. 93A is not one of those unusual statutes, such as the pre-1978 version of G. L. c. 258, § 2,[4] which specified that the issue "shall be tried by the court without a jury." The emphasis of the court in *Nei* v. *Burley, supra*, which dealt with the rights of a party whose demand for a full jury trial had been denied, and in other authoritative commentary on the issue of the right to a jury trial, is on the benefits of a jury trial. The thrust of the commentary is that, in certain circumstances, a litigant may be entitled as of right to the *extra* protections afforded by a trial before an impartial jury of his peers. The focus is not on any supposed benefits to a litigant flowing from a bench trial. Consequently, it would be "almost unprecedented" to regard the award of a jury trial as reversible error (*National Sur. Corp.* v. *Musgrove*, 310 F.2d 256, 262 [5th Cir. 1962]), and, not surprisingly, our search of the Massachusetts cases has revealed no judgment reversed because a jury trial was improvidently granted. Compare *Gechijian* v. *Richmond Ins. Co.*, 305 Mass. 132, 143-144 (1940). The jury's verdict of liability on the c. 93A claim, therefore, will stand.

*The jury verdict for Charles River for breach of contract.* In determining whether the verdict of the jury awarding Charles River contract damages in the amount of $200,000 must be set aside on appeal, we view the evidence and the reasonable inferences to be drawn therefrom in the light most favorable to the prevailing party. There was ample evidence on which the jury, properly instructed by the judge,[5] could find a material

---

[4] Statute 1978, c. 512, § 15, amended the General Laws by striking the old c. 258 and replacing it with a new one.

[5] We do not consider the Kirkseys' claim that the judge erred in instructing the jury concerning their rights under the mortgage termination clause. The Kirkseys had the right to terminate in the event of a demand from the mortgagees if the sale of "some or all" the reserved lots should be insufficient to satisfy the loans. Both Charles River and the Kirkseys attributed signifi-cance to the Kirkseys' attempt to use the clause. Charles River claims it was

breach by the Kirkseys. We so rule even assuming that any breach committed before June 3, 1981, was waived by the signing of the supplement to the BLI on that date. The sale of lots 5 and 6 to Hanner Built was probably the most serious breach.[6] The jury could have found numerous other ways in which the Kirkseys fell short of their undertakings, including the failure to complete roads and other specified work on time, the inability to convey good title due to problems with Marlborough's conservation commission, and the failure to cooperate in joint marketing efforts. Even if some of the breaches the jury could have found were not material in themselves, they could be so regarded when considered along with the sale of lots 5 and 6. See Restatement (Second) of Contracts, Reporter's Note to § 241 comment b (1981), citing *Tolstoy Constr. Co.* v. *Minter*, 78 Cal. App. 3d 665 (1978) (many relatively small defects in construction of a house).

The Kirkseys claim that, since Charles River did not build any houses on the lots owned by the Kirkseys, there was a complete nonperformance of Charles River's principal obliga-

---

used in bad faith and that its use was a material breach. The Kirkseys claim its use was effective to establish that point in time beyond which it clearly had no obligation to perform under the contract. The Kirkseys claim that the judge erred in instructing the jury that the clause required the sale of "all" reserved lots rather than "some or all" of the reserved lots. Even if we were to agree that the instruction was improperly worded, the judge's attention was not drawn to that wording in a manner sufficiently pointed to identify the inaccuracy for him to correct or to preserve that issue for appeal. *Narkin* v. *Springfield*, 5 Mass. App. Ct. 489, 491 (1977). Mass.R.Civ.P. 51(b), 365 Mass. 816 (1974).

[6] The defendants argue that the judge ruled that this breach was not material. In a discussion with the attorneys on requested jury instructions for the damages recoverable against Hanner Built, Hanner, and Mitrakas for interference with Charles River's advantageous relations with the Kirkseys, the judge stated that he did not agree that the sale of lots 5 and 6 was a substantial breach of the BLI. Even if the judge did not personally agree that the sale of lots 5 and 6 by itself would constitute a material breach, this was a question of fact for the jury, the answer to which must be upheld if there is support for it in the record. As Charles River points out, there was evidence before the jury that lot 5 was a crucial lot for the development of the subdivision, that the Kirkseys knew of its importance to Charles River and that Charles River had objected strenuously to previous attempts to sell it to another party.

tion under the contract, thereby excusing the Kirkseys from performing their part of the bargain. But the Kirkseys overlook the numerous delays and problems in completing their work under the BLI which, if considered material breaches, excused Charles River's failure to build houses on the remaining lots. See *Quintin Vespa Co.* v. *Construction Serv. Co.*, 343 Mass. 547, 554 (1962); *Ward* v. *American Mut. Liab. Ins. Co.*, 15 Mass. App. Ct. 98, 100 (1983). In addition, there was evidence that Charles River was ready, willing, and able to sell and build on some lots but was prevented from doing so by the Kirkseys' failures to obtain necessary permits and releases from the conservation commission's order of conditions and to remove a drainage easement on one lot. "A promisee is not required to perform until the conditions necessary to his performance have been satisfied." *Pas-Teur, Inc.* v. *Energy Sciences, Inc.*, 11 Mass. App. Ct. 967, 969 (1981).

The defendants also maintain that certain testimony of Kenneth Kaplan, Charles River's vice president, to the effect that constructive financing could not be obtained unless Charles River received title to the lots, established the fact that Charles River could not perform the contract as agreed. The argument is based on the language in the BLI which states, "This agreement is contingent upon Charles River obtaining construction financing." It was admitted that Charles River had requested that the Kirkseys convey title to the lots on which Charles River planned to build, and that a commitment from the Home National Bank was conditioned on Charles River's having title. There is no indication in any of the testimony, however, that this was the only means by which Charles River could obtain construction financing. At one point, in fact, the arrangement with the bank was referred to as "an alternative kind of financing." Moreover, there was testimony that Charles River could have obtained the capital necessary for construction through the sale of lots 2 and 47 and the reinvestment of the resulting proceeds. The jury could have found that, by building on and selling the lots in a serial manner, Charles River had the financial ability to build up to twenty-two houses prior to the termination of the BLI. Thus, the jury could have believed that

Charles River could have met its obligation under the BLI by providing its own financing, irrespective of its ability to obtain outside financing.

Finally, the Kirkseys contend that they could not market the lots jointly with Charles River because the BLI referred to the marketing of houses and lots as packages, and there were no houses built to be jointly marketed. The jury could have believed Kaplan's testimony, however, that the parties contemplated pursuing a marketing plan to "pre-sell" lots on which houses had not yet been built so that the buyer could choose a particular house design.

Since the evidence would have warranted a finding in a considerably larger amount, and since the jury were properly instructed on measuring contract damages by the conventional formula of lost profits, their award of $200,000 damages for breach of contract was not excessive.

*The jury verdict on the claims against three of the defendants for interference with advantageous contractual relations.* The jury returned verdicts in the amount of $100,000 against Hanner, Hanner Built and Mitrakas for interference with Charles River's advantageous contractual relations with the Kirkseys. The defendants now challenge the verdicts on procedural grounds. Included gratuitously in answer to the jury question relating to the interference claim was the jury's notation of percentages before the name of each of the three defendants. The defendants neither moved to strike the verdicts nor to seek clarification before the jurors were discharged.[7] In his memorandum of decision, the judge determined that the added material was probably intended as an assessment of the respec-

---

[7] Under Mass.R.Civ.P. 49(b), 365 Mass. 813 (1974) ("General Verdict Accompanied by Answer to Interrogatories"), not directly applicable, but analogous, "[t]he rule clearly contemplates a motion [objecting to the verdict] prior to dismissal of the jury, for it envisages that the judge may order reconsideration of the answers and the verdict." *McCue* v. *Prudential Ins. Co. of America*, 371 Mass. 659, 663 (1976). See also *Uloth* v. *City Tank Corp.*, 376 Mass. 874, 884 (1978).

tive culpability of each of the three defendants found liable. The jurors had not been instructed to provide that information, no reference having been made in the instructions to degrees of culpability. The judge held the percentage assessments to be "a nullity," ruling that the three defendants were liable jointly and severally for the damages.

The defendants argue that they are entitled to have a new trial inasmuch as the verdicts are evidence of the jurors' utter confusion. Indulging, as we must, "every reasonable intendment" in favor of the verdicts, we would feel compelled to order a new trial only if it were clear that the answers were inconsistent or clearly indicative of failure to follow instructions. *McCue* v. *Prudential Ins. Co. of America*, 371 Mass. 659, 664 (1976). *Holder* v. *Gilbane Bldg. Co.*, 19 Mass. App. Ct. 214, 218 (1985). See also *Atlantic & Gulf Stevedores, Inc.* v. *Ellerman Lines*, 369 U.S. 355, 364 (1962); *Mashpee Tribe* v. *New Seabury Corp.*, 592 F.2d 575, 590 (1st Cir.), cert. denied, 444 U.S. 866 (1979); Smith & Zobel, Rules Practice §§ 49.7, 49.9 (1977). Cf. 5A Moore's Federal Practice par. 49.03[4], at 49-28 n.7 (2d ed. 1985). Whatever the jury's reason was for including the percentages, they were superfluous findings. In putting the form of the verdicts in proper shape, the judge was not changing their substance or usurping a function exclusively within the province of the jury. Compare *Minot* v. *Boston*, 201 Mass. 10, 13-14 (1909). A new trial is not called for.

*Issues raised by Charles River on its cross appeal.* Charles River claims dissatisfaction with the amount of its recovery of the c. 93A claim. Although the verdict form indicated that the jury were to assess damages on the c. 93A claim, the judge gave no instructions on damages. None of the parties objected to this lapse in the charge. The jury not only assessed damages in the amount of $75,000 but added, gratuitously, that this amount was "not included" in the $200,000 contract damages.

Notwithstanding the jury's gratuitous endorsement, the judge ordered the $75,000 subsumed in the contract award.[8]

Although an award of c. 93A damages over and above a related contract recovery is theoretically possible if the claims and injuries are "factually separable and distinguishable," see *Calimlim* v. *Foreign Car Center, Inc.*, 392 Mass. 228, 236 (1984), there is no basis for awarding Charles River an additional recovery in this case. In the absence of a proper instruction limiting the jury to a consideration of those losses suffered as a direct result of the unfair and deceptive practices and not included within the contract award, the jury would be free to base the award on improper elements. It would be pure guesswork for us to say that the jury's award was based on acts related to the unfair and deceptive practices but factually separable from those on which the contract damage award was based. Unless based on separate facts, the award would be improperly duplicative.[9] Moreover, Charles River must be deemed to have waived the issue of its right to separate damages on its c. 93A claim by failing to object to the form of the question put to the jurors. Mass.R.Civ.P. 49(a), 365 Mass. 812-813 (1974).

Also, with regard to the c. 93A claim, Charles River complains of the failure of the judge to award it costs over and above statutory costs. In particular, Charles River seeks reimbursement for the $8,400 it expended for an expert witness. The witness, a real estate appraiser, testified about the expected fair market value of the houses to be built and the expected time required for marketing them. These points were of some

---

[8] In his memorandum of decision the judge ruled that if out-of-pocket losses occasioned by the Kirkseys were separately recoverable, the evidence permitted a recovery in an amount not greater than $18,300.

[9] Charles River also argues that any c. 93A recovery ought to be at least doubled because the violation was "knowing or wilful" within the meaning of G. L. c. 93A, § 11, inserted by St. 1972, c. 614, § 2. The issue of Charles River's right to multiple damages was not submitted to the jury but, with the agreement of all parties, was decided by the judge as a question of fact. None of the reasons advanced for setting aside the judge's decision merit reversal or even discussion. See *Bachman* v. *Parkin*, 19 Mass. App. Ct. 908, 910 (1984), and cases cited at 910.

significance, particularly in assessing contract damages. The judge awarded Charles River $50,000 for attorneys' fees, more than the amount requested on an hourly basis, and statutory costs. Although in a c. 93A case "reasonable expert witness fees should normally be recoverable . . . in order to vindicate the policies of the act," *Linthicum* v. *Archambault*, 379 Mass. 381, 389 (1979), the award of such fees is discretionary. *George* v. *Coolidge Bank & Trust Co.*, 360 Mass. 635, 640 (1971). *Geraci* v. *Crown Chevrolet, Inc.*, 15 Mass. App. Ct. 935, 937 (1983). Considering the multiplicity of claims litigated in addition to the c. 93A claim and the significance of the expert witness' testimony in connection with the common law contract claim, see *Hanner* v. *Classic Auto Body, Inc.*, 10 Mass. App. Ct. 121, 124 (1980), we do not think the judge's implicit denial of the plaintiff's request for the award of an expert witness fee was an abuse of discretion.

Two other contentions made on the cross appeal also lack merit. One of the questions on the verdict form related to the claim against Hanner, Hanner Built, and Mitrakas for interference with Charles River's advantageous contractual relations with the Kirkseys. This claim pertained to the Kirkseys' sale of lots 5 and 6. The jury assessed damages in the amount of $100,000 and, in response to a specific question posed in the verdict form, found that amount not subsumed in the contract damages. The judge in his posttrial memorandum of decision vacated the award, however, ruling as matter of law that these damages were subsumed in the contract damage award.[10] Ordinarily the damages flowing from a breach of contract overlap with the damages flowing from a tortious interference by a third party with the advantages of that contract. Restatement (Second) of Torts § 774A(2) and comment e (1979). See also *Laurendeau* v. *Kewaunee Scientific Equip. Corp.*, 17 Mass. App. Ct. 113, 120-121 (1983); *Ross* v. *Holton*, 640 S.W. 2d 166, 173 (Mo. 1982). A recovery based upon tort principles

---

[10] The judge also ruled that the evidence justified damages in an amount no greater than $50,000, and a reduction to that amount was accepted by Charles River.

in excess of the contract damages is theoretically possible. There is no evidence in the record of an out-of-pocket loss, however, to justify such a recovery. Moreover, the judge, without objection, told the jurors nothing about how to measure the damages and what particular kinds of losses would not be subsumed in the contract award. To reach the verdict on what was before them by way of evidence and instruction would have required the jurors to engage in unwarranted speculation.

Another of the questions on the verdict form dealt with the question of good faith. In its complaint, Charles River had claimed a breach by the Kirkseys of a fiduciary duty arising out of the BLI, which was alleged to be a joint venture. The question put to the jury in connection with this claim asked whether they found for Charles River or the Kirkseys "[o]n the lack of good faith theory. . . ." In his instructions relating to that question, the judge told the jury, without objection, that a duty of good faith on the Kirkseys' part was implied in the joint marketing arrangement and that, if the Kirkseys "sabotaged" the joint marketing effort, even in the absence of a formal breach of the BLI, a finding for Charles River on the good faith theory would be justified. The jury did so find in the amount of $50,000. They specifically found those damages included in the contract award, however. The judge entered judgment notwithstanding the verdict for the reason that he had made a finding of fact that there was no joint venture between Charles River and the Kirkseys. We fail to see any defect in the verdict, even on the assumption that the parties were not engaged in a joint venture.

Even if it was error for the judge to set aside the verdict, however, there was no harm to Charles River. The jury's determination that the damages flowing from the breach of duty to act in good faith were included in the contract award was entirely proper. The jury were correctly instructed without objection on the considerations they were to apply in deciding whether the damages overlapped. The good faith obligation was implied in the contract, and failure to act in good faith is the equivalent of a breach of the contract. Except in extraordinary situations, the award of the benefits of the contract would

fully compensate a party for his losses based upon a breach of duty to act in good faith in carrying out a contractual obligation.

*Conclusion.* Although the facts of the case and the procedural issues are complex, and although the respective parties challenge many of the decisions made by the judge and the jury over the course of the lengthy proceedings, we have found no basis for setting aside any aspect of the judgment.

*Judgment affirmed.*