**O'CONNELL MANAGEMENT CO., INC., Plaintiff,**

v.

**CARLYLE–XIII MANAGERS, INC., et al., Defendants.**

**Civ. A. No. 90–10414–C.**

United States District Court, D. Massachusetts.

June 17, 1991.

Joseph A. Pisarri, Corwin & Corwin, Boston, Mass., Richard C. Pierce, North Quincy, Mass., Paul A. Epstein, Law Offices of Paul A. Epstein, Quincy, Mass., for plaintiff.

Christopher Edward Mullady, Day, Berry & Howard, Boston, Mass., James L. Ackerman, Day, Berry & Howard, Boston, Mass., for defendants.

## MEMORANDUM

CAFFREY, Senior District Judge.

This case is before the Court on the defendants', Carlyle Real Estate Limited Partnership–XIII, JMB Realty Corporation, Neil G. Bluhm, and Judd D. Malkin ("Carlyle"),[1] motion for summary judgment pursuant to Fed.R.Civ.P. 56(c). The plaintiff, O'Connell Management Company, Inc. ("O'Connell"), commenced this action against the defendants for the alleged wrongful termination of a real estate management agreement between O'Connell, as manager, and Carlyle, as owner. Jurisdiction is founded on diversity of citizenship and the amount in controversy exceeds $50,000. For the reasons stated be-

---

1. The defendants, JMB Realty, Bluhm, and Malkin are general partners in Realty Associates– XIII, which in turn is a general partner in Carlyle.

low, the defendants' motion for summary judgment should be denied.

## I.

Considering the facts in the light most favorable to the plaintiff, the relevant undisputed facts are as follows. In March 1984, O'Connell entered into a written real estate management agreement with Carlyle to manage a building owned by Carlyle at One Heritage Drive, Quincy, Massachusetts. The agreement expressly provides that O'Connell owes a fiduciary duty not to divert potential tenants of One Heritage Drive to any other office building in the Quincy area.[2]

This duty not to divert is qualified, however, for paragraph 9B recognizes that O'Connell may owe concurrent fiduciary duties to owners of other commercial buildings in the Quincy area. According to the agreement in the event a conflict arises it would not constitute a breach of the agreement for O'Connell to divert potential tenants to other buildings to which it owes a concurrent fiduciary duty. The agreement further provides that O'Connell has thirty days to cure any non-monetary material default after written notice is provided to O'Connell by the owner.

O'Connell Development Company is in the business of developing residential and commercial real estate projects. O'Connell Management, the plaintiff, and O'Connell Development are two separate corporations. Williams S. O'Connell is the Vice President and part owner of both corporations. O'Connell Development, along with other investors, entered into a joint venture to develop a parcel of land known as Marina Bay also located in Quincy. According to the terms of the joint venture agreement, O'Connell Development was responsible for developing the Marina Bay property.

Early in 1989, the Kemper Group ("Kemper") was in the market for a long-term lease of office space, and was considering a number of buildings in the Quincy area, including Marina Bay and One Heritage Drive. In February 1989, James Nolan of Marina Bay Real Estate Services, received an inquiry from Codman Associates and Kemper regarding long-term office space in Marina Bay.[3] Nolan informed Mr. O'Connell of the inquiry from Codman and Kemper, and requested his permission to submit a proposal to Codman. Mr. O'Connell granted this request. At the time the proposal was made to Codman and Kemper, One Heritage Drive was fully leased until June, 1991.

During this same time period, Carlyle was engaged in discussions with Spaulding & Slye, Kemper's brokers, formulating a formal proposal to offer to Kemper office space at One Heritage Drive. In order to make room for Kemper, Carlyle was also in the process of negotiating with one of its Heritage Drive tenants for the release of its excess space in the event Kemper accepted Carlyle's proposal. Hassan Haydar, an O'Connell employee and the on-site manager of One Heritage Drive, fully cooperated with Carlyle in its efforts to obtain the

---

2. Paragraph 9B of the management agreement provides in full:

Manager acknowledges that it has a fiduciary duty to owner not to divert any potential tenants of the business property to any other office building in the Quincy, Massachusetts area; and owner acknowledges that manager may have a similar fiduciary duty to the owners of other buildings in such area managed by manager or a related party, affiliate or subsidiary of manager not to divert potential tenants of such other buildings to the business property. Consistent with the foregoing, in the event manager or any related party, affiliate or subsidiary of manager manages other office building space in the Quincy, Massachusetts area, then, if suitable space is available in the business property, manager shall in a fair and reasonable manner inform any potential tenant of such suitable space in the business property; provided, however, that nothing herein shall be deemed to prevent manager from informing potential tenants of other suitable space in other buildings managed by manager (or any related party, affiliate or subsidiary of manager) and with respect to which manager has fiduciary duties similar to those which manager has to owner hereunder.

3. The terms of the proposal also provided for a temporary tenancy at One Monarch Drive in Quincy, an office building managed by O'Connell and owned in part by O'Connell Development Company.

Kemper lease by making certain the premises were presentable when Kemper inspected them.

When Carlyle learned on June 5, 1989, of the offer made to Kemper, authorized by Mr. O'Connell, regarding space in Marina Bay, on June 5, 1989, it notified O'Connell of its intention to terminate the management agreement, alleging a breach of fiduciary duty under paragraph 9B of the management agreement. Upon receipt of this notice, Mr. O'Connell, on behalf of Boston Harbor Marina, immediately withdrew the offer made to Kemper. Then on July 19, 1989, after thirty days had passed, Carlyle terminated the agreement. Upon termination of the agreement, O'Connell commenced this action against Carlyle alleging wrongful termination of the real estate management agreement seeking to recover as damages the profits it would have received over the remaining twenty-three months of the agreement.[4]

## II.

The defendants have moved for summary judgment pursuant to Fed.R.Civ.P. 56(c). Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R. Civ.P. 56(c). The party moving for summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). The moving party may satisfy this burden by showing that there is an absence of evidence to support the non-moving party's case. *Celotex*, 477 U.S. at 325, 106 S.Ct. at 2553. Only after the moving party has met its burden of coming forward with proof of the absence of any genuine issue of materi-

al fact does the party opposing the motion bear the burden of responding. *Id.* at 321, 106 S.Ct. at 2551; *Adickes*, 398 U.S. at 159–60, 90 S.Ct. at 1609–10. The opposing party may not rest upon the mere allegations or denials in its pleading, but must respond with affidavits or otherwise to show the existence of a genuine issue for trial. Fed.R.Civ.P. 56(e); *Adickes*, 398 U.S. at 159–60, 90 S.Ct. at 1609–10. A dispute about a material fact is a "genuine issue" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986). In essence, the inquiry is whether a jury question is presented. *Id.* at 249, 106 S.Ct. at 2510. On summary judgment, the inferences to be drawn from the underlying facts must be viewed in the light most favorable to the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962). Mindful of this standard, this Court shall examine the defendants' motion for summary judgment.

The management agreement expressly provides that Massachusetts law shall govern its construction and interpretation. *See* Paragraph 11C. It is well-settled under Massachusetts law that the interpretation of a contract is generally a question of law. *Edmonds v. United States*, 642 F.2d 877, 881 (1st Cir.1981); *Freelander v. G. & K. Realty Corp.*, 357 Mass. 512, 516, 258 N.E.2d 786 (1970); *Daley v. J.F. White Contracting Co.*, 347 Mass. 285, 288, 197 N.E.2d 699 (1964). Where the wording of a contract is unambiguous, the contract must be enforced according to its terms. *Freelander*, 357 Mass. at 516, 258 N.E.2d 786. If the contract contains ambiguities, however, a question of fact for the jury may be presented. *Gillentine v. McKeand*, 426 F.2d 717, 721 (1st Cir.1970); *Trafton v. Custeau*, 338 Mass. 305, 307–08, 155 N.E.2d 159 (1959). The determination of

---

4. Plaintiff alleges it suffered actual damages in the amount of $149,131.00, plus interests and costs.

whether the terms of a contract are ambiguous is a question of law. *Fashion House, Inc. v. K Mart Corp.*, 892 F.2d 1076, 1083 (1st Cir.1989) (contract terms are considered ambiguous "where an agreement's terms are inconsistent on their face or where the phraseology can support reasonable difference of opinion as to the meaning of the words employed"); *RCI Northeast Services. Div. v. Boston Edison Co.*, 822 F.2d 199, 202 (1st Cir.1987).

■ Applying these rules of construction to the contract provisions in question, this Court finds that the contract is not ambiguous. The plain meaning of the relevant provisions, which were explained in the background section of this opinion, need not be repeated here. Having determined that the agreement is unambiguous, the Court will next consider the defendants' argument in favor of summary judgment.

The defendants argue that O'Connell breached a material obligation, thus excusing them from further performance under the agreement, after providing O'Connell with thirty days' notice of its intention to terminate the agreement. The defendants further contend that summary judgment is appropriate because no material question of fact exists regarding plaintiff's breach. The plaintiff admits that an offer was made to Kemper with respect to a long-term lease in Marina Bay. O'Connell disputes, however, that this proposal made to Kemper constituted a breach of paragraph 9B, which prohibited it from diverting potential tenants unless it had a conflicting fiduciary duty that required otherwise. Furthermore, even if the plaintiff did breach the terms of the agreement in making the offer, the plaintiff argues that the breach was not material so as to warrant the defendants' termination of the agreement.

■ It is well-settled that an uncured, material breach by one party excuses the other party from further performance under the contract. *Petrangelo v. Pollard*, 356 Mass. 696, 701–02, 255 N.E.2d 342 (1970); *Quintin Vespa Co. v. Construction Serv. Co.*, 343 Mass. 547, 554, 179 N.E.2d 895 (1962); *Ward v. American*

*Mut. Liab. Ins. Co.*, 15 Mass.App.Ct. 98, 100, 443 N.E.2d 1342 (1983). The issue whether a party substantially complied with the terms of an agreement or whether the actions of a party constitute a material breach is a question of fact, not a question of law. *Cetrone v. Paul Livoli, Inc.*, 337 Mass. 607, 610, 150 N.E.2d 732 (1958); *Lander v. Samuel Heller Leather Co.*, 314 Mass. 592, 595–96, 50 N.E.2d 962 (1943); *Glines v. Berry Box & Package Co.*, 248 Mass. 518, 523, 143 N.E. 344 (1924); *Charles River Constr. Co. v. Kirksey*, 20 Mass.App.Ct. 333, 339–40 & n. 6, 480 N.E.2d 315 (1985); *see also* E. Farnsworth, *Contracts* § 8.16 (1990); J. Calamari & J. Perillo, *The Law of Contracts* 409 (1977); Restatement (Second) of Contracts § 237 (1981). Whether a breach is material is determined by the circumstances of each case. *Boston Hous. Auth. v. Hemingway*, 363 Mass. 184, 200, 293 N.E.2d 831 (1973). In determining materiality, the factors to be considered by the finder of fact include the following:

(a) the extent to which the injured party will be deprived of the benefit which he reasonably expected;

(b) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived;

(c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture;

(d) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances; and

(e) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing.

Restatement (Second) of Contracts § 241 (1981); *see also Ward*, 15 Mass.App.Ct. at 101, 443 N.E.2d 1342.

■ In this case, under the terms of the management agreement, O'Connell owes a fiduciary duty to the defendants not to divert potential tenants of One Heritage Drive to any other office building in the

Quincy area. The terms of the agreement expressly provide, however, that this duty not to divert is not unequivocal. Paragraph 9B clearly states that "nothing herein shall be deemed to prevent manager from informing potential tenants of other suitable space in other buildings managed by manager ... and with respect to which manager has fiduciary duties similar to those which manager has to owner hereunder." Thus, the agreement provides that O'Connell, when it owes a concurrent fiduciary duty, may inform potential tenants of suitable space available in other buildings located in the Quincy area. Construing the facts and inferences in the light most favorable to the plaintiff, this Court finds that a genuine issue of material fact exists regarding whether the proposal made or authorized by Mr. O'Connell to Kemper constituted a material breach of the agreement. This Court cannot say, as a matter of law, whether the plaintiff's actions in making the offer to Kemper did or did not defeat the object of the parties as expressed in paragraph 9B. Thus, the issue whether the plaintiff's actions constituted a material breach of the agreement is inappropriate for decision on a motion for summary judgment.

Although this issue of material fact, regarding the materiality of the alleged breach, is sufficient to deny the defendants' motion it is also worth noting that, even assuming O'Connell's actions did constitute a breach of the agreement, there also exists a question of fact whether the default was curable and whether it was cured upon Mr. O'Connell's withdrawal of the proposal made to Kemper. Under the terms of the agreement, O'Connell has the right to cure any alleged deficiency after it receives written notice of default from the owner. Paragraph 2A(1)(a) further requires that the owner give O'Connell thirty days' written notice prior to termination in order to afford it the opportunity to cure the alleged non-monetary material breach.[5] The agreement also provides that if the non-monetary default cannot be cured within thirty days, O'Connell will not be in default if it promptly commences the curing of such material breach and diligently pursues the same to completion.

■ Whether a party to a contract adequately cured a breach depends upon the facts and circumstances of the case. *See* Farnsworth, *Contracts* § 8.18 (whether a material breach was cured is a question of fact); *cf. Shane v. Winter Hill Fed. Sav. & Loan Assoc.*, 397 Mass. 479, 482–83, 492 N.E.2d 92 (1986) (the intention of the parties contemplated that the defendant would have the right to cure any default). Thus, the issue of whether the alleged breach was cured is also a question of fact for the jury.

In this case the plaintiff argues that it cured any default that may have existed upon Mr. O'Connell's withdrawal of the proposal made to Kemper. In response, the defendants contend that the breach was non-curable. Therefore, construing the facts in the light most favorable to the plaintiff, a genuine issue of material fact exists regarding whether the breach was curable, and if it was curable, whether the plaintiff adequately cured the breach when it revoked the offer made to Kemper.

---

5. Paragraph 2A(1)(a), which addresses the owner's right to terminate the agreement, provides:

   2. *Term.*
   A. The term of this Agreement shall commence on the date hereof and shall continue to midnight of June 30, 1991. This Agreement shall be subject to earlier termination as follows:
   (1) Owner may terminate this Agreement (by written notice of termination to Manager) at any time after: (a) the occurrence of a material default by Manager hereunder or by Seller under the Sale Agreement and the failure of such defaulting party to cure the same within ten days after written notice by Owner of such material default when the material default (*"Monetary Default"*) is the failure to pay a sum payable hereunder or under the Sale Agreement, and within 30 days after written notice by Owner of such material default when the same (*"Non–Monetary Default"*) is other than a Monetary Default (provided, however, that if such Non–Monetary Default cannot be cured within said 30–day period, then this Agreement shall not be terminated if Manager promptly commences [or causes to be commenced] the curing of such material default within said 30–day period and diligently pursues the same to completion)....

For all the reasons stated above, defendants' motion for summary judgment should be denied.

Order accordingly.